WALLACE v. RAILROAD.

(Filed May 28, 1906).

*Railroads—Negligence—Evidence—Master and Servant—Use of Appliances—Contributory Negligence—Pleadings as Evidence.*

1. In an action for the death of a brakeman alleged to have resulted from the giving way of an insecurely nailed crosspiece used to keep steady lumber loaded on a flat car, which deceased took hold of in getting down from the lumber to the floor of the car to make a coupling, evidence that it was customary for brakemen on lumber cars, loaded as this one, to make use of the crosspieces as deceased did, was competent.

2. Where, in an action for the death of a brakeman alleged to have resulted from the giving way of a crosspiece insecurely nailed to standards on a flat car loaded with lumber, which deceased took hold of in getting down from the lumber to the floor of the car to make a coupling, there was evidence that though the primary use of the crosspiece was to keep the lumber steady, such crosspieces were customarily used by brakemen in descending from the lumber to the floor of the car to make a coupling, the court did not err in refusing to nonsuit the plaintiff.

3. The master's acquiescence in the use of an application for some purpose other than that for which it was intended puts him in the same position as if the appliance had been originally furnished for that purpose.

4. The duty of the railroad company to have the crosspiece secured in a reasonably safe manner for the use to which its servants customarily put it, is not affected by the fact that the shipper puts it on in loading the car.

5. Where the railroad company recommended to shippers that crosspieces, used to keep steady lumber on flat cars, should be secured to the standards by ten-penny nails, it was a question for the jury whether the use of eight-penny nails was evidence of negligence in that respect.

6. The introduction of a modified admission of one allegation of the complaint cannot have the effect of changing the entire theory of the case.

7. Where the evidence was conflicting in regard to the safest way to have made the coupling, the court did not err in refusing to hold as a conclusion of law that plaintiff's intestate was guilty of contributory negligence because he selected the most dangerous way.

ACTION by Sarah A. Wallace, Administratrix of Minor T. Wallace, against Seaboard Air Line Railway, heard by *Judge Charles M. Cooke* and a jury, at the October Term, 1905, of the Superior Court of MECKLENBURG.

Plaintiff administratrix sues for damages sustained by the death of her intestate by reason of the alleged negligence of the defendant. The facts alleged in the complaint and admitted in the answer are as follows: Defendant is engaged in the business of a common carrier between the city of Charlotte, N. C., and points to and between the State line in Virginia and other States. On the night of March 14, 1904, one of its freight trains, consisting of nine cars, was being backed through the city of Charlotte towards the freight depot, the leading car being loaded with lumber. Said train was backed for the purpose of coupling the lumber car to two other cars on said track, near 11th street, and was under the control and management of defendant's conductor, Mr. Ramseur. Plaintiff's intestate, M. T. Wallace, was employed on said train as a switchman or brakeman, his duty being

throwing switches, coupling and uncoupling cars. He was under the order and direction of said conductor, whose instructions and orders it was his duty to obey. The said conductor and plaintiff's intestate were together on the said lumber car. The said car was loaded with lumber four and one-half feet high, piled thereon, and on each side of the said car there were standards and from the standards on the one side to those of the other, at the end of said car, a piece of lumber was nailed to said standards across said car and over said lumber; said crosspiece was fastened to said standards with three eight-penny nails in each end thereof. Defendant recommended to those of its patrons who loaded cars for shipment over its lines compliance with the rules of the Master Car Builders' Association, which rules require that the boards nailed upon standards across the lumber be fastened at each end by not less than three ten-penny nails. As the said train was being backed, as aforesaid, in a southerly direction towards the said freight depot, the conductor told the plaintiff's intestate that there were two cars somewhere near 11th street; that they were to couple the said two cars on to the said train or lumber car and shift back up town; that plaintiff's intestate took hold of the said crosspiece as a support to sustain him, and while attempting to climb down over the front end of the lumber it pulled or was jerked loose and plaintiff's intestate fell upon the track and was killed. In addition to the foregoing facts, the plaintiff alleged that when her intestate took hold of the said crosspiece for the purpose of making the coupling, that he had a right so to do, and it was usual in such cases in order to prepare the coupling, or see that it was prepared, so that it would couple to the said two cars for which said train was being backed; and that in the performance of his duty and in pursuance of the orders of the conductor it was necessary for him to hold on to said crosspiece. That defendant was negligent in failing to have said crosspiece so securely fastened that it would not

jerk loose when he took hold of it for a support; that the coupling on the said cars was so defective that it was necessary for her intestate, in the discharge of his duties, to prepare said knuckle on the said car before the impact with the other car to which it was to be coupled, so that it would couple by impact. There were other allegations of negligence, but as no testimony was introduced tending to sustain them, it is not necessary to set them out. The defendant contended that the crosspiece which plaintiff took hold of was put upon the car for the sole purpose of holding the lumber in place and not as an appliance or way for the plaintiff's intestate to get into a position to make the coupling, or that it was customary or usual to use such crosspiece for such purpose. It is further alleged that said crosspiece was used for the temporary purpose of holding the lumber upon the car, and is cast aside and disposed of with the lumber itself. Defendant also insisted that plaintiff's intestate was guilty of contributory negligence in attempting to get into a position to couple the cars. Plaintiff introduced one Freeland, who testified that he saw the car a short time after the accident, supposed it was loaded with weather boarding, about four or five feet high above the floor of the car, as cars are usually loaded; that he examined it next morning; that if lumber was loaded up to within eight or ten inches of the front end of the car, there would be room enough for a man to stand on the car sideways. Described the appearance of the track where the plaintiff's intestate was killed. Has had considerable experience in railroad business; knows part of the rules of defendant company with reference to brakemen and switchmen. Has worked as a coupler or switchman about two months for defendant. Was made conductor in Savannah. Witness was asked whether he was acquainted with the customary use by brakemen or switchmen on defendant road at or about the time Wallace was killed, of crosspieces nailed across from the rear standards of a lumber car, when that is

the leading car of a train being backed, in going upon or descending from the car—to which he answered "yes." He was then asked as to the customary use of such crosspiece at the time. Defendant objected, objection overruled and exception. Witness stated that the customary way of going across lumber cars is getting up on the end of them and reaching up and getting hold of that crosspiece, and sometimes the standards are held together by wires instead of crosspieces, in which case you get hold of them and pull right up. That is the natural way. He knows the custom of couplers getting down to the front of a moving car loaded with lumber, by catching hold of the crosspieces for the purpose of making coupling. He knows the purpose for which crosspieces are nailed across standards. Witness is then asked a hypothetical question involving the conditions described, to which defendant excepted. He said: "Coming down off the lumber car, you come right to the end that the box car is on. The safest way would be to go to the rear of the lumber car and get down to the floor and catch hold of the side ladder on the box car and swing around on it and then descend on the side ladder to the ground. It is necessary for a man to take hold of the crosspiece to let himself down to the floor of the car. There is always a crosspiece here. It is natural for a man to come around where the crosspiece is. There is no man that can reach to the top of the lumber car." The witness was asked other questions of the same character not necessary to be set out in full. Upon cross-examination he said that he had gone down over the front end of lumber cars similar to the one in question for the purpose of making a coupling and had seen other men do it. "I never saw any one attempt to go down over the front end of such a car while it was in motion and light on the track in front of it. He would go down on the flat car here and adjust the coupling. Never saw any one get down over the front end of the car on the track when the car was moving. That would be an un-

usually dangerous performance, I think. Won't say that I
ever attempted to get down upon the floor of the car where
there was only eight inches space and stand there and reach
over and adjust the coupling of the cars. I never measured
the exact space. It would not be, however, a physical impos-
sibility to do so." He describes how the coupling is made.
Plaintiff introduced other witnesses who were examined,
under objection, in regard to the manner of making couplings,
the safe way to do, etc. Plaintiff also introduced witnesses in
regard to the difference between eight and ten penny nails.
There was much evidence tending to show the different meth-
ods in which coupling should be made under such circum-
stances. Defendant introduced no evidence and demurred
to the plaintiff's evidence. Demurrer overruled and defend-
ant excepted. Defendant submitted a series of instructions
to His Honor, each of them concluding with the request to
direct the jury to answer the first issue "no." No specific
instructions were asked upon the second issue. The jury
answered the first issue "yes" and the second issue "no." His
Honor instructed the jury that it was the duty of the
railroad company to provide reasonably safe appliances
for the descent of its brakemen and switchmen when en-
gaged in the performance of duty, and when, because of
the character of a load upon a flat car, it is impracticable
to provide a permanent appliance for that purpose, and
there is an appliance in common use in connection with
cars so loaded, and the main purpose of which is to steady
and secure the load of lumber on said car, but that it
is the custom of brakemen and switchmen in the perform-
ance of their duties to make use of said appliance for de-
scending from said load of lumber, and is habitually used
for that purpose, and the company had notice thereof, then
it would be an appliance for the purpose, and it would be the
duty of the railroad company to exercise reasonable care in
providing that such appliance was reasonably safe for the

said purpose, under all the circumstances, and considering the other use for which it was made. If a railroad company fails to perform·its duty in this regard, and in consequence of such failure injury results to one of its brakemen when employed in the performance of his duty, that would be negligence, and if it is the proximate cause of the injury it would be actionable negligence. That plaintiff's intestate was where he had a right to be and where it was his duty to be. That the conductor had the right to control the movements of the train and to direct the intestate within the sphere of his duty. After stating the admitted facts, and such as were not contradicted, His Honor said: "Upon this state of facts, the question of the defendant's negligence and your answer to the first issue will depend upon the jury's finding as to whether or not it was the custom of the brakemen of the defendant company to use planks, located as this one was, as a handhold for the purpose of descending from the top of the load of lumber, loaded as this one was, when engaged in the performance of their duty, or was habitually used by them for that purpose, which was known to the intestate and defendant company, and whether or not the defendant company exercised reasonable care in providing that such plank was so nailed to the standards that it was reasonably safe for such purpose. If the jury shall find that there was this said custom and habitual use by the brakemen of the defendant company of .this said appliance as a handhold in the performance of their duties, and shall further find that the said reasonable care had not been exercised by the defendant company in providing that said appliance should be reasonably. safe for said purpose, then the defendant company would be guilty of negligence; and if the jury shall find that it was the proximate cause of the injury and the subsequent death of the intestate they will respond to the first issue 'yes.' But if they shall not so find upon either one of these propositions, they will answer the first issue 'no.'" His

Honor properly defined reasonable care and proximate cause, stating to the jury that the burden was upon the plaintiff upon the first issue. Upon the second issue, His Honor instructed the jury, the burden being upon the defendant, that "While the defendant company, by its conductor, had the right to direct the intestate to make the coupling, and it was his duty so to do, there is no evidence that the conductor directed as to the method and manner in which he should perform his duty, and he was, in order to relieve himself of negligence, required to exercise reasonable care in that regard, and if the jury shall find that there was more than one way of descending from said pile of lumber, and that the descent from the front end of the pile of lumber was not reasonably safe, and that it was obvious, and that the intestate by the exercise of reasonable care could have discerned it, and shall further find that there was some other way which was reasonably safe, and which the intestate by the exercise of reasonable care could have discovered, and that in consequence of that he was injured and died, then that would be the proximate cause of his injury and death, and the jury should answer the second issue 'yes;' but unless the jury shall so find they will answer this issue 'no.' The conductor being on the car with the intestate, and he having control of the movements of the train, the failure to stop the train before the intestate attempted to descend from the pile of lumber would not be imputed to the intestate for negligence." To this charge the defendant noted many exceptions and assigned a large number of errors both in failing to give instructions asked and in instructions given.

*Brevard Nixon* and *J. D. McCall* for the plaintiff.
*Burwell & Cansler* for the defendant.

CONNOR, J., after stating the case: The defendant excepted to the ruling of the court, admitting testimony regard-

ing the customary way by which brakemen, on lumber cars, loaded as the one upon which intestate was injured, descended from the lumber piled on the car, to the floor of the car for the purpose of making coupling. Freeland says: "I know custom of couplers getting down to the front of a moving car, loaded with lumber, by catching hold of the cross-piece for the purpose of making coupling." In reply to a question he says: "It would have been necessary for him to get where he could have seen whether the coupler was properly adjusted. If these knuckles had been adjusted right he could have gotten down to the floor of the lumber car and adjusted the coupling as it approached the other car. * * * In going down to the front end of the car he would have been compelled to hold to the crosspiece on the end of the car in getting down, and after he got down he would have been compelled to hold to the ends of the lumber while making preparations to adjust the coupling. I don't know of my own knowledge what the custom of defendant's employees is anywhere except in Charlotte and Savannah." He then gives the extent of his knowledge and observation. Dellinger says that he knew the customary use to which crosspieces of standards at the end of lumber cars, loaded as this one, was put by the employees of the defendant company. That the crosspiece is put there to hold the lumber together, but they use it for holding to it in going up and down over the end of the car. He would take hold of the crosspiece and then take hold of the ends of the lumber. The only way for a man to get off a lumber car would be to go over the end of it. He could not have gotten off on the side—he would have killed himself. By going to the front end of the car to make the coupling he can get his work done quicker." Bradley testified that he knew the custom, etc. "The crosspieces are put there to stay the load as far as the shipper is concerned and to keep the standard from spreading at the top, but it is an habitual thing, with switchmen and couplers, in going over lumber

cars, when they go to get down the ends of them to catch hold of the crosspiece to get down by. They do it frequently when the standards are close enough to the end for them to do so. * * * When they are anywhere like 15 or 20 inches from the end they make a good handhold to get down by and practically the only handhold that they have got. *  *,  * I would just climb down over the pile of lumber and stand on the floor of the car in a ten inch space, reach out and put my foot on the bumper and adjust the knuckle and then turn around and climb back. Have done it many a time and seen it done many a time." Troutman, yard conductor for Southern, testified that he saw the car on which intestate was killed; he described the manner in which the car was loaded, standards and crosspieces. They are put on by shipper and removed by him when car is unloaded. He described manner of men in getting on top of lumber, etc. We have omitted those parts of the testimony upon which defendant relies to sustain its defense. We will consider them in that connection. The materiality of the testimony in regard to the custom of employees engaged in making couplings of cars loaded with lumber, as the one upon which intestate was killed, arises out of the fact that the crosspiece to which intestate caught hold was not primarily intended for that purpose. The liability of defendant for negligence in regard to securing them is dependent upon the secondary use to which it is claimed they were put by the employees. As we shall see, later on, this question becomes both material and pivotal in one aspect of the case. Defendant's counsel in the conclusion of their able and exhaustive brief say that the exceptions, 1st to 8th inclusive, are to be considered in connection with the 9th exception to the refusal of the judge to sustain the demurrer to the evidence. We think, for the purpose for which it was received, the testimony objected to was competent. If the crosspieces are to be treated as coming within the statutory definition of "ways or appliances," much of this

testimony would be immaterial and irrelevant. That they
do so is vigorously contested by the defendant. The pro-
bative force of this testimony as sustaining the plaintiff's
contention is for the jury, and was so submitted by His
Honor. Taking, for the purpose of the demurrer, the fact of
the custom to be established, we have the following facts
bearing upon the defendant's alleged negligence. A train of
nine cars (plaintiff's intestate being upon the rear one) was
being backed over the defendant's road in the city of Char-
lotte for the purpose of coupling with others standing upon
the track. The rear flat-car was loaded with lumber, sawed
plank, piled on the car to the height of 4½ or 5 feet. The
ends of the planks came within eight or ten inches of the end
of the car. Standards or pieces of wood of the proper size
were placed in sockets on the sides of the car to steady the
lumber. A piece of wood of sufficient size was nailed to the
standards near the end of the car over the top of the pile of
lumber, secured by three eight-penny nails at each end. The
car was loaded and the standards and crosspieces furnished
and placed on the car by the shipper. The defendant recom-
mended to its patrons, loading cars with lumber for shipment
over its lines, compliance with the rules of the Master Car
Builders' Association, revised 1901, that when the specified
fastenings are by means of boards, there must be two boards
for every pair of standards and be fastened at each end by
not less than three ten-penny nails. These crosspieces were
placed for the purpose stated by the plaintiff's witnesses, and
used by employees in the manner herein stated by said wit-
nesses. On the night of the injury, the conductor and the
intestate were on the lumber car while being backed to the
other cars for the purpose of coupling. As the said train was
being backed, as aforesaid, towards the freight depot, the con-
ductor told the intestate that there were two cars somewhere
near the bridge, and that they were to couple the said cars
on to said train or lumber car and shift back up town. The

cars were some four or five hundred feet away at that time. It was the duty of the plaintiff's intestate to obey said orders. While attempting to climb down over the front end of the moving lumber car to the floor, the intestate took hold of, and held to, the said crosspieces which pulled off, or were jerked loose by the intestate, who thereupon fell upon the track when the car ran over and killed him. The car was used by the defendant in its interstate commerce for the transportation of lumber.

The defendant contends that upon these facts the court should hold as a matter of law: 1. That crosspieces were not an appliance. 2. That the intestate was using a crosspiece for a purpose for which it was not intended. 3. That it was not defective.

For support of these propositions counsel cite a number of cases. In the view which we take of the case, and in which it was submitted to the jury by the judge below, it is not necessary to decide whether the crosspiece is within the meaning of the statute (Revisal, section 2646,) "a way or appliance" with the resulting consequences for a defect therein. It may be conceded that it is not such an appliance as the automatic coupler, or iron handhold, or many other parts of the equipment of the car, coming clearly within the language of the statute. It may also be conceded that the primary purpose for which it is placed on the car or nailed to the standard, is to keep the lumber steady. The witness concurring in that statement and many of the authorities cited by the defendant tend strongly to sustain its contention in that respect. The question, however, upon which the defendant's liability depends, is whether, in addition to the primary use, it was adapted to and used by the employees for a secondary purpose—descending from the lumber to the floor of the car for the purpose of adjusting the knuckle and making the coupling. If this contention is correct, and the custom of using the crosspieces was sufficiently established to fix upon the defendant notice

thereof, thereby imposing a liability to use reasonable care
to have such crosspieces reasonably safe in their attachment
to the standards, the authorities would seem to sustain the
court in refusing to nonsuit the plaintiff.   Judge Thompson,
after stating the general rule in regard to the use of ap-
pliances not contemplated, says: "But this does not exclude
the conclusion that the master may be liable when he has con-
structed an appliance for a particular use, but permits his
servant to put it to another use, and in so using it the ser-
vant is injured through its negligent construction."   4 Thom.
Neg., 4000.   In *Brimer v. Railroad,* 109 Mo. App., 493, it
appeared that the car upon which the plaintiff was employed,
when injured, was used for hauling dirt; it had standards
on either side about three feet high with forked tops; planks
were used to hold the dirt, and secured by being placed in the
forks; the plaintiff worked on a car equipped with standards
and planks; and he was ordered by the foreman to work on
another car on which one of the standards had no fork, and
one of the planks rested on the top of the standard—a flat
surface.   The plaintiff was ignorant of this condition, and
while the train was in motion, to steady himself, he put his
hand against the plank, one end of which was in the fork and
the other on the standard, having no fork.   It slipped off and
the plaintiff was thrown from the car and injured.   It was
shown that the workmen were in the habit of steadying them-
selves, while the train was in motion, by putting their hands
on the boards on the standards.   *Goode, J.,* said: "The main
propositions invoked here are that the defendant was not
guilty of negligence, in as much as the boards and standards
were suitable for use as they were intended to be used, to-
wit, retaining the dirt on the car; that in attempting to use
them for another purpose, the plaintiff assumed the incident
risk and that he was guilty of contributory negligence in
not looking to see if both ends of the board rested in forks
before he put his hand against it.   We must decline to accept

either of these propositions. They may be considered together as they were based on the theory that the planks and standards were intended only to keep the carload of dirt in place, and being reasonably safe for that purpose, the defendant's whole duty was discharged. No doubt the primary purpose in supplying the car with standards and planks was to retain the dirt, but the railroad company was bound to use care to provide its workmen a reasonably safe place to work, and the evidence shows beyond doubt that this duty was disregarded. When laid in the forks of the standards, as they were in every instance except one, the planks afforded so convenient a means of steadying the standing workmen as the train moved along, that the men would inevitably put their hands against them to resist the jolting of the train. This was habitually done, according to the evidence, and should have been anticipated by the company, not only as a customary, but as a perfectly natural act. Now in leaving an end of one plank loose on the smooth top of a standard, while all the other planks securely rested in forks twelve inches deep, the defendant furnished the plaintiff and his co-workmen an unsafe place to work; for the crew properly may be said to have worked in traveling to and fro between the loading and unloading places. At any rate they were in the line of duty. As ordinarily the boards rested in the forks when the train was in motion, and thereby afforded the men a means of supporting themselves and a protection against being jolted from the train or jostled about, it was negligence not to have the boards lodged so they could not slip under pressure of the hand." In *Babcock v. Johnson,* 120 Ga., 1030, 1035, *Lamar, J.,* discussing the principle involved in regard to the legal responsibility of the employer for injuries sustained in the use of instrumentalities furnished for other purposes, says: "Whether it would make any difference in the legal responsibility would depend in part upon his duty, at the time, in reference to the care, maintenance and inspection of the in-

strumentality causing the peril. That, in turn, would in part depend upon the use for which it was intended and upon whether the master knew that the servant must, or probably would, divert the appliance to a use not originally intended. For if a master directs an appliance to be used or knows that it will reasonably be used, for some purpose other than that for which it was originally intended, he puts it in the same position as if he had originally furnished it for that purpose. But the fact that it had been diverted to a new use will not render him liable, if that diversion occurred, without his knowledge or consent." In *McDonald v. Svenson* 25 Wash., 441, a longshoreman was injured in using, as a support, some part of the rigging of a vessel in passing from the ratline to the wharf and was injured in its giving way. The court in discussing the question of liability, said: "The rigging was thus used commonly, and by the master, for the purpose of reaching the wharf. The respondent was justified in concluding that it was intended to bear a man's weight. That would be its natural and obvious purpose. And we are unable to see that, as a question of law, the respondent was guilty of contributory negligence in using the means provided for ascending from his work to the wharf." *Bushby v. R. R.,* 107 N. Y., 374; *Coates v. R. R.,* 153 Mass., 297. A large number of cases are cited by counsel for plaintiff and defendant showing some divergence of opinion in the application of the principle to the peculiar facts of each case. Mr. Labatt, in his valuable work on Master and Servant, reviews the cases and concludes: "If new functions are imposed upon an instrumentality by the master himself, or his representative, and the servant is thereby exposed to undue risks, the master must answer for the injury resulting from those risks, and cannot excuse himself by showing that the instrumentality was a suitable one for the performance of the work for which it was originally supplied. The master's acquiescence in the use of an appliance for some purpose other

than that for which it was intended puts him in the same position as if the appliance had been originally furnished for that purpose. Accordingly, a qualification of this rule that a servant cannot recover in the absence of evidence showing that the appliance in question was constructed with reference to the use to which it was being put when the accident occurred, is admitted in cases when it appears customary for employees to put it to that use, and that the master knew of this custom." 1 Labatt, sec. 27. This, we think, is the correct rule. His Honor, therefore, in the light of the evidence could not have withdrawn the case from the jury for the reason that the use of the crosspiece by the intestate was improper. In the case of *Babcock v. Johnson, supra,* there was no evidence that the brace to which plaintiff caught hold was used for the purpose of supporting the defendant's servants in the discharge of their duty. That the duty of the defendant to have the crosspiece secured in a reasonably safe manner for the use to which its servants customarily put it is not affected by the fact that the shipper puts it on in loading the car is well settled. If the defendant permits the shipper to load the car it is as much, and in the same degree, liable for an injury sustained by its servant by negligence on the part of the shipper as if its own servant had loaded it. *Bushby v. R. R., supra.* It would seem that the rule adopted by the Master Car Builders' Association, requiring the crosspiece to be secured to the standard by three ten-penny nails at each end, the observance of which rule was recommended by defendant to its customers, is evidence that it was the safe way of securing the crosspiece and the admission that the crosspiece on the car upon which plaintiff's intestate was injured only eight-penny nails were used is evidence that the crosspiece was not reasonably secure. In the view which we are now considering the evidence, these facts were admitted. We cannot say as a matter of law that the failure to use the ten-penny nails, and the use of the smaller size, was no

evidence of negligence in that respect. His Honor fairly submitted the question to the jury.

While defendant notes a number of exceptions to the refusal to instruct the jury as requested and to the instructions given, counsel, in concluding their brief, say that the real controversy is dependant upon the 9th exception. "All other exceptions as appear in the record are abandoned except in so far as they have a direct bearing upon the 9th exception." The motion for judgment of nonsuit involves in addition to the first issue the proposition that upon the most favorable view of plaintiff's evidence her intestate was guilty of contributory negligence. Before discussing this phase of the case it is proper to notice a question raised by defendant in regard to paragraph 19 of the complaint. After describing the position of her intestate on the car and the order of the conductor, she says: "The plaintiff's intestate then got down in a stooping position on the front end of the said lumber car and in doing so he held to the piece of lumber that was nailed across the top of said lumber car. That he took hold of said crosspiece as a support to sustain him, as he had a right to do, and as was usual in such cases, in order to prepare the coupling, or see that it was prepared, so that it would couple to the said two cars for which said train was being backed." These two paragraphs are denied. Paragraph 19: "The plaintiff's intestate took hold of, and held to the said crosspiece, which pulled loose with him, or let him fall on the track when the car ran over him," etc. The answer contains the following, which was introduced by plaintiff: "Answering article 19 of the complaint this defendant says that it admits that the plaintiff's intestate while attempting to climb down over the front end of the moving lumber car took hold of and held to the said crosspiece therein referred to which pulled or was jerked loose," etc. Defendant contends that having introduced this admission for the purpose of proving the manner of the death of her intestate that she thereby conclusively

established the facts it purports to admit and that plaintiff
was precluded from contradicting such facts. That the effect
of this admission is to establish the fact that intestate, when
he took hold of the crosspiece, attempted to get off the moving
car at the front end thereof. If this is so and the defendant
is correct in saying that it is solemnly fixed by such admission
there would seem to be no doubt that, in view of the entire
evidence as well as the reason of the thing, intestate was guilty
of gross negligence which would, as a matter of law, be the
proximate cause of his death. Every witness says that this
would have been dangerous, one saying, that if this was the
purpose he must have "meant to commit suicide." If de-
fendant is correct in its contention in this respect of course
no evidence in regard to a custom to take hold of the cross-
piece for the purpose of getting over the end of the lumber
on to the floor of the car to adjust the knuckle of the coupler
was competent. It is difficult to understand how a sane man
would attempt to get off the front end of a moving car, thereby
courting certain death. Certainly the language of the com-
plaint taken as a whole is not, in our opinion, reasonably
capable of such construction. We cannot think that the de-
fendant by making a modified admission of one allegation
connected with others, being different links in the narrative,
can change the entire theory of the case. There can be no
doubt of the proposition laid down by the learned counsel re-
garding the probative force of admissions. We do not think
that they sustain the conclusion sought to be drawn from
that. The manifest purpose of the plaintiff was to allege
that her intestate, being told by the conductor that they were
to couple the cars, went to the front end of the lumber piled
on the car and took hold of the crosspiece for the purpose of
letting himself to the floor of the car to make the coupling.
This, we think, is a fair construction of the pleadings, and
while the only living witness to the accident was not intro-
duced, this view is sustained by the testimony. Every wit-

ness upon cross-examination said that while they had seen couplers get upon the floor of the car, they never saw one get off the front end of a moving car. The entire complaint in respect to the manner in which intestate came to his death should be read in connection with the admission in the answer and should be liberally construed with a view to substantial justice between the parties. Revisal, section 495.

Defendant next insists that His Honor should have held as a conclusion of law that plaintiff's intestate was guilty of contributory negligence, because he selected the most dangerous of two ways to do his work. That he should have gone to the rear end of the car, gotten upon the ladder on the end of the box car next thereto and swung himself on to the ground, going thence to the front of the flat car and making the coupling from the ground. The evidence in regard to the relative safety in doing this was conflicting. Dellinger says: "I do not think it would have been safer to have gone to the rear of the car and gone down by way of the ladder." It is not practicable to set out all of the testimony, but an examination of it discloses considerable diversity of opinion in regard to the safest way to have made the coupling, frequently the same witness upon cross-examination giving different opinions. In this condition of the evidence His Honor could not have taken the case from the jury and directed an affirmative verdict upon the second issue. This is too well settled to require the citation of authority. The language of *Holmes, J.,* in *Coates v. R. R., supra,* is applicable to this case. Discussing a similar question, he says: "The jury were warranted in finding that the plaintiff, although not directed to get on this particular car, naturally would do so and would be expected to do so in carrying out his orders, and in the way in which he did, and that he might have done so prudently if the jawstrap had been there. We cannot say, as a matter of law, that there

was no prudent way of getting on to this kind of car for men experienced in the business, or that the way adopted was not the best." In this case the conductor was in charge of the train, he gave the order to make the coupling which it was the duty of plaintiff's intestate to obey in the usual customary way, unless it was obviously dangerous. There was evidence tending to show that if the crosspiece had not given way he could with safety have performed the duty in the way he was pursuing. It would undoubtedly have required care after reaching the floor to have maintained his position on the very narrow space afforded, not over ten inches, but by reason of the crosspiece giving way he never reached the floor, hence the condition with which he would have been confronted did not arise. He may have successfully met them. The proximate cause of his fall was the failure of the crosspiece to sustain him. It is evident that the conductor did not intend to stop the train before making the coupling. He was approaching the car slowly. If there was any negligence in this respect it is under our Fellow Servant Law imputed to the defendant. *Fitzgerald v. Railroad,* at this term. We have examined this record and the exhaustive well considered briefs, together with many of the authorities cited, with care. We find no error in His Honor's ruling. The jury, upon competent testimony and correct instructions, have passed upon every phase of the case.

The judgment must be

Affirmed.