Argued October 5, reversed and remanded with directions, November 3, rehearing denied December 21, 1926.

# CURTIS W. CAMPBELL *v.* SOUTHERN PACIFIC COMPANY.

(250 Pac. 622.)

**Master and Servant.**

1. In action under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), plaintiff must allege and prove negligence.

**Master and Servant—Common-law Rule of Evidence Applies to Action for Injuries to Switchman from Defective Box-car Door Handle (Federal Employers' Liability Act [U. S. Comp. Stats., §§ 8657–8665]; Safety Appliance Act [U. S. Comp. Stats., § 8605 et seq.]).**

2. In switchman's action, under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), for injuries caused by defective door handle on box-car which is not one of the safety appliances mentioned in Safety Appliance Act (U. S. Comp. Stats., § 8605 et seq.), rule of evidence in common-law action for negligence applies.

**Master and Servant—Railroad Need Exercise Only Reasonable Care to Furnish Reasonably Safe Suitable Tools and Working Place, under Statute (Federal Employers' Liability Act [U. S. Comp. Stats., §§ 8657–8665]).**

3. Railroad is charged with only reasonable care to furnish its employees with reasonably safe tools adapted to their purposes and a reasonably safe place in which to work, under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), when Safety Appliance Act (U. S. Comp. Stats., § 8605 et seq.), does not apply.

---

1. See 18 R. C. L. 826.
2. See 18 R. C. L. 858.

Pleading—Injured Switchman's Allegation in Action, Under Statute, That Box-car Door Handles were Designed for Opening and Closing Doors Held Binding on Him (Federal Employers' Liability Act [U. S. Comp. Stats., §§ 8657–8665]).

4. Switchman injured because of defective handle on box-car is bound by his allegation, in action under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), that such handles were designed for opening and closing the doors.

Master and Servant—Switchman Using Box-car Door Handle for Purpose for Which It was not Designed Might not Recover for Injuries (Federal Employers' Liability Act [U. S. Comp. Stats., §§ 8657–8665]).

5. Under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), switchman who used handle of box-car door to raise himself to look into the car and was injured, because handle was defective, might not recover, since handle was designed for opening and closing door.

Master and Servant—Custom to Use Box-car Door Handle for Purpose not Designed Could not Make Railroad Liable to Switchman, Where Railroad Forbade Practice (Federal Employers' Liability Act [U. S. Comp. Stats., §§ 8657–8665]).

6. Custom of using handle of box-car door to raise oneself in looking in car, though handle was not designed therefor, would not impose liability for injury to switchman from defective handle, under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), where railroad forbade practice.

---

Master and Servant, 39 C. J., p. 320, n. 25, p. 326, n. 47, p. 469, n. 73, p. 807, n. 17, p. 993, n. 38.

From Multnomah: J. U. Campbell, Judge.

Department 1.

This action was brought by the plaintiff to recover damages from the defendant for personal injuries received in the course of his employment. He was a switchman and engaged in switching cars in the yards at Eugene. Desiring to look into an ordinary freight-car for the purpose of ascertaining whether or not it was empty, he placed his feet on the truss-rod underneath the car and took hold of the handle of the door to raise himself so as to look into the car. The handle of the door gave way and the plaintiff fell, resulting in the injury for which he seeks to

recover damages. This action was instituted under the federal Employers' Liability Act. At the close of the testimony the defendant moved for a directed verdict. The motion was denied and a verdict for plaintiff was returned by the jury. A judgment was duly entered in accordance with the verdict. Defendant appeals assigning a number of errors, including the ruling of the court on the motion for a directed verdict. That motion is based upon the ground that the complaint does not state facts sufficient and there is no evidence of negligence on the part of the defendant. Other alleged errors were assigned in support of the motion, but it is not deemed necessary to consider them in this opinion.

REVERSED.    REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Ben C. Dey* and *Mr. Roscoe C. Nelson,* with an oral argument by *Mr. Nelson.*

For respondent there was a brief over the name of *Messrs. Lord & Moulton,* with an oral argument by *Mr. Wm. P. Lord.*

COSHOW, J.—1–3. It is settled law that in an action under the federal Employers' Liability Act it is necessary for the plaintiff to allege and prove negligence in order to recover. A door handle on a box-car is not one of the safety appliances mentioned in the Safety Appliance Act. The same rule of evidence therefore obtains in this case as would control in a common-law action for negligence: *Mondou* v. *New York R. R. Co.,* 233 U. S. 49 (56 L. Ed. 346, 32 Sup. Ct. Rep. 169, 38 L. R. A. (N. S.) 44, see, also, Rose's U. S. Notes) ; *New Orleans & N. E. R. Co.* v. *Harris,* 246 U. S. 367 (62 L. Ed. 1167, 38 Sup. Ct.

Rep. 535, see, also, Rose's U. S. Notes Supp.);
*Looney* v. *Metropolitan R. R. Co.,* 200 U. S. 480, 486
(50 L. Ed. 564, 26 Sup. Ct. Rep. 303) ; *Finn* v. *Oregon
W. P. & Ry. Co.,* 51 Or. 66 (93 Pac. 690) ; *Duntley*
v. *Inman,* 42 Or. 334 (70 Pac. 529, 59 L. R. A. 785).
These authorities and many others announce the doc-
trine that a railroad company is not the insurer of the
safety of the appliances and tools but is charged with
the exercise of reasonable care to furnish its em-
ployees with reasonably safe tools adapted to the
purpose for which they are to be used and a reason-
ably safe place in which to work: *Rush* v. *Oregon
Power Co.,* 51 Or. 519, 525 (95 Pac. 193).

The evidence relied upon by the plaintiff to estab-
lish negligence on the part of defendant is as follows:
Plaintiff testified that the foreman of a switching
crew has a switching list containing the number of
cars to be moved; that

"the switch lists, supposed to be correct, but they
are not, sometimes they are and sometimes they are
not.

"Q. What does the man following the engine do?

"A. To go in on that track he couples the engine
on and when they pull out over the switch he makes
the cut of cars, how many of them they want to let
loose, if they want to kick them.

"Q. What if anything does he do, usually, ordi-
narily, with respect to observing the condition and
contents of the cars that are in the train?

"A. Well, if he looks in, he saves himself that
extra walking. He knows where the cuts are going
to be.

"Q. How can you tell where your cuts are going
to be by looking into the cars?

"A. Well, you know you are taking the empties and
leaving the loads, or part loads.

"Q. Now, in the ordinary practice of railroading,
under such circumstances as that, just explain to the

jury how the brakeman, or the man following the engine, observes the inside of a car.

"A. Well, as tall as I am if the car is standing still I can look in by standing on the ground. If the car is moving a little, you can't look in by standing on the ground because you can't see where you are walking when looking into the car. You would have to put your feet on the truss rod and put your hands on the handle of the door and look in. The handle of the door—

"Q. In the experience railroading you have had, how often is it that a man following the engine puts his foot on the truss rod and takes hold of the door handle and swings up and looks in?

"A. I have seen it happen several times a day.

"Q. Is there any other way of looking in when the car is in motion?

"A. No way whatever."

Witnesses for plaintiff C. C. Hibbard and Warren Wilson testified to the same effect. Hibbard testified as follows:

"Q. Do you know what is the usual and customary method followed by switchmen and brakemen getting into the ordinary box cars that are used by the Southern Pacific Company?

"A. Well, about the only way you can get in is to catch hold of the handle of the door and put your foot on the truss rod and catch hold of the side of the door with your other hand and put your knee up in there, or your other foot, and pull yourself up.

"Q. And how are those handles on the other side constructed?

"A. Why, they are either put on by lag screws or bolted through the door.

"Q. What is the fact as to whether they are commonly strong enough to sustain the strain that is put on them by pulling up that way?

"A. Yes, I have never had one to give way with me. They seem to be plenty strong enough to hold.

"Q. How frequently do trainmen use them for that purpose?

"A. Very often. Whenever they have need to get into a car when they are using the car for local freight or have to get in for any reason.

Cross-examination.

"Q. And you say it was customary for you, when a train was moving, to grab hold of the handle of a door and swing your feet on the truss rods to look inside of the car?

"A. That is about the only way you could do it if the train was moving."

Wilson testified:

"Q. What is the usual and customary method of a brakeman looking into a moving car to see what is in it?

"A. Why, the only method is to grab hold of the hand-hold of the door with one hand and the edge of the door with the other and use the truss rods as a stirrup to look in.

"Q. Does that occur very often in yard service?

"A. Every day.

"Q. Are those hand-holds on the doors of sufficient weight to sustain a man's weight, ordinarily?

"A. Why, yes."

Plaintiff also relies upon the testimony of two witnesses for the defendant. F. E. Cavender, master car-repairer of the defendant, testified to the effect that all of the cars of the defendant or under its control are inspected before any switching is done in the yards at Eugene; that in case a handle on the door of a car is found out of order it is either repaired there on the track or is taken off and later properly attached to the car. Mr. Harrington, the yard-master at Eugene who had full charge of the movement of the cars in the yards at Eugene, testified that the

door handles were seldom ever used for sliding the doors and further:

"It is very handy to take hold of the handle when the door opens easily.

"Q. Well, what is the fact as to whether or not it is the practice for brakemen, switchmen and yardmen to ride the trains by grabbing this handle on the door and throwing their feet on the truss rod underneath?

"A. Well, that has been done a great many times."

But this witness also testified to the effect that when he had seen brakemen or switchmen so using the door handle and the truss-rod he had invariably ordered them to stop it and that the practice was dangerous. Meyers, another witness for the defendant, also testified that there were lots of men using the door handle as plaintiff did when he received the injury. The witness Cavender also testified that the door handle was not designed to stand the strain of a pull such as it received when the plaintiff received his injury; that the fact that a handle on the door was loose was not considered a defect but was generally removed so it would not be lost or become a hazard at any time. A great many cars were used without handles on the door. There is no evidence that we have been able to find and none has been pointed out to us in the brief which brings home to the company the knowledge that the door handles and truss-rods were being used as plaintiff was using them at the time of his injury. The only connection between the alleged custom of the switchmen so using the door handle is the testimony of Meyers who was a member of the switching crew at the time plaintiff was injured. Both Cavender and Harrington testified that it was a dangerous practice and absolutely forbidden by the officials of the company when their

attention was directed to it. There is an entire absence of any conduct on the part of the company indicating acquiescence in such use of the door handle. There is no evidence to indicate that the company had any reason to believe that the door handle would be so used. The uncontroverted testimony is that it was not constructed with such a use in view. The case note to the case of *Chicago etc. Co.* v. *Murray,* 85 Ark. 600 (109 S. W. 549, 16 L. R. A. (N. S.) 984), is introduced with the following statement of the law:

"The courts are unanimous upon the proposition that, if a servant uses a machine furnished by his master, for a purpose other than for which it was intended, and which was never contemplated by, or known to, the master, the servant takes the risk of all injuries arising from such use, and cannot hold the master liable therefor."

3 Labatt's Master & Servant (2 ed.), Section 921, states the rule thus:

"A general principle which is frequently conclusive against the servant's right to maintain an action is that the master's duty in respect to his instrumentalities is restricted to seeing that they are reasonably safe for the performance of the functions for which they are designed."

And in page 2458 in the same section, quoting from *Morrison* v. *Burgess Sulphite Fibre Co.,* 70 N. H. 406 (85 Am. St. Rep. 634, 47 Atl. 412), as follows:

" 'Although it is a master's duty to use due care to furnish his servants tools and appliances suitable for the purpose for which they are provided, he owes them no such duty when they put his tools to uses for which they were not intended.' It is 'not negligence to omit a precaution applicable only to a situation which did not in fact exist.' It is universally agreed, therefore, that an employer is not liable where

120 Or.—9

the servant's injury was not caused by any defect in the appliance which affected its safety when it was used in the ordinary manner and for the purposes for which it was intended.''

See, also, *Durgin* v. *Munson,* 9 Allen (Mass.), 396 (85 Am. Dec. 770).

4, 5. Plaintiff's complaint contains this allegation:

"That the handle of said door to said freight car was fastened on with screws and the defendant had permitted the woodwork around said handle to become so rotten and decayed that it would not tightly hold the screws, and as a result, when plaintiff took ahold of said handle the said handle came out and caused plaintiff to lose his balance and fall over onto the ground, striking his head as hereinbefore alleged; that yardmen and switchmen in the performance of their said work are often required to take ahold of the handles on the doors of freight cars, and the said handles are built and designed for the purpose of opening and closing doors and are required to sustain a considerable weight and pull, and in the exercise of ordinary care the defendant should not have permitted the screws holding said handle to become loose, or the woodwork around the same to become decayed and defective, and the defendant was negligent in this respect.''

There is no allegation in the complaint that the handle which gave way causing the alleged injury was designed to withstand the strain placed upon it by the plaintiff when he received the injury. The plaintiff is bound by his allegation that the handles on the doors of freight-cars were designed for the purpose of opening and closing the door. Under the general rule, therefore, the plaintiff would not be entitled to recover because his injury was received while using the door handle for a purpose other than that for which it was designed.

6. The plaintiff seeks to avoid the consequences of that allegation by his attempt to show that it was the custom for the brakemen and switchmen to use the door handle as plaintiff did. But this would not take the case out of the general rule, unless plaintiff further alleged and proved that this custom was known to or acquiesced in by the defendant. The cases relied upon by the plaintiff have been carefully examined but do not support the contention of the plaintiff. *Gekas* v. *Oregon-Washington R. & Nav. Co.*, 75 Or. 243 (146 Pac. 970), was a case where the plaintiff was injured by using a defective adz. The defendant made the same defense as is made in the instant case, namely: That the plaintiff had the right to select his tool and voluntarily chose an unsafe tool in this that the adz was not designed to do the work in which plaintiff was engaged. The record, however, shows that Gekas was told to use that particular tool by the foreman of the section-gang of which Gekas was a member; that the defect in the adz was not discernible to the workman but was readily discovered by the tool repairers when the adz was heated; that the adz had recently been repaired. The Gekas case is different from the case at bar in the very fact that the plaintiff was required to use that particular tool to do the specific work in which he was engaged at the time he was injured. Gekas was obliged to obey the orders of his superior. The case of *Brimer* v. *Chicago B. & Q. R. Co.*, 109 Mo. App. 493 (85 S. W. 653), is analogous in some respects, but the opinion in that case contains the following language:

"Besides being obviously convenient as a support ·for the standing workmen, *they were constantly availed of for that purpose with the defendant's knowledge and consent.*"

In the instant case there was no evidence that the alleged custom of using the door handle in the manner used by plaintiff was either known to the defendant or acquiesced in by it. Plaintiff was content to rest upon the testimony of himself and two other employees that it was a common practice for switchmen to so use the handle. The evidence on behalf of the defendant tends to bring to the knowledge of the officers of the company notice that brakemen and switchmen used the cars and also tends to show that it was without the consent of the company and forbidden because of its obvious dangers. Another interesting case annotated in 13 L. R. A. (N. S.) 384, is *Wallace* v. *Seaboard Air Line Railway,* 141 N. C. 646 (54 S. E. 399), from which we take the following excerpt:

"No doubt the primary purpose in supplying the car with standards and planks was to retain the dirt; but the railroad company was bound to use care to provide its workmen a reasonably safe place to work, and the evidence shows beyond doubt that this duty was disregarded. When laid in the forks of the standards, as they were in every instance except one, the planks afforded so convenient a means of steadying the standing workmen, as the train moved along, that the men would inevitably put their hands against them to resist the jolting of the train. *This was habitually done, according to the evidence, and should have been anticipated by the company, not only as a customary, but as a perfectly natural, act.* * * As ordinarily the boards rested in the forks when the train was in motion, and thereby afforded the men a means of supporting themselves and a protection against being jolted from the train or jostled about, it was negligence not to have the boards lodged so they could not slip under pressure of the hand."

"Accordingly, a qualification of this rule, that a servant cannot recover in the absence of evidence

showing that the appliance in question was constructed with reference to the use to which it was being put when the accident occurred, is admitted in cases where it appears that it was customary for employees to put it to that use, and that the *master knew of this custom.* But the mere fact that an appliance had been diverted to new uses before the accident in suit will not render the master liable, if that diversion occurred without his knowledge or consent." 3. Labatt's Master & Servant (2 ed.), § 923.

See, also, 4 Thompson on Negligence, § 4000.

The testimony relied upon by plaintiff to charge negligence to the defendant does not go far enough to constitute any evidence of negligence on its part. Plaintiff should have gone further and shown either that the custom of using the door handle as plaintiff did was so general and had been used for such a length of time that it would be presumed that the company had knowledge thereof and consent thereto or he should have shown that the company actually knew of the practice and assented thereto. Plaintiff not only failed to do that but the evidence shows without contradiction that when the proper officials of the defendant observed its brakemen or switchmen so using the door handles they forbade the practice because of its obvious dangers.

The motion for a directed verdict should have been allowed. The judgment is reversed and the case remanded with directions to dismiss the case.

REVERSED AND REMANDED WITH DIRECTIONS.

REHEARING DENIED.

MCBRIDE, C. J., and BURNETT and BEAN, JJ., concur.