## CHICAGO, B. & Q. R. CO. v. MURRAY
(No. 1540; May 21, 1929; 277 Pac. 703)

326

For the plaintiff in error, there was a brief by *Hagens & Murane,* and *Nichols & Stirrett,* all of Casper, and oral argument by *A. E. Stirrett & C. D. Murane.*

For the defendant in error, there was a brief by *R. R. Rose* of Casper, and *L. A. Kiplinger,* and oral argument by *R. R. Rose.*

328

KIMBALL, Justice.

The plaintiff sued for damages for personal injuries alleged to have been caused by defendant's negligence. The plaintiff obtained a verdict and judgment for $28,500, and defendant brings the case here by proceeding in error.

It is conceded that at the time of plaintiff's injury both he and defendant were engaged in interstate commerce, and that the case is controlled by applicable federal laws.

The plaintiff was employed by defendant as a locomotive engineer operating steam-propelled locomotives. He

claimed that his injury was caused by a defect in a part of the sanding apparatus of the locomotive on which he was working. A rule promulgated by the interstate commerce commission under authority of the Boiler Inspection Act, cited infra, provided (Rule 120) that:

"Locomotives shall be equipped with proper sanding apparatus, which shall be maintained in safe and suitable condition for service, and tested before each trip."

The supply of sand on the locomotive in question is contained in a receptacle called the "sand dome," which is about 2½ feet in diameter, 2 feet in height, and located on top of the front half of the boiler. There are two methods of transferring the sand from this dome to the rails. One is by force of compressed air, and that is the usual method of use when compressed air is available for that purpose. The apparatus for operating the sander by that method is called the "air sander." The other method is by lever that opens valves in the bottom of the sand dome permitting the sand to flow by gravity to the rails. This method of operating the sander is customarily resorted to when the air sander will not work, and is referred to as an emergency or secondary method. The apparatus for operating the sander by this method is called the "hand sander."

The hand sander is controlled from the cab of the locomotive by the movement by hand of a "reach rod." This reach rod is an iron tube or pipe, about 18 feet in length, and ¾ inch outside diameter. One end of it is in the right-hand side of the cab, whence it extends along the right-hand side of the top of the boiler to the bottom of the sand dome where the other end is connected by bolt with a perpendicular arm that leads into the sand dome. About midway of its length, the reach rod passes through the eye of a supporting bracket attached to the boiler. The defect of which the plaintiff complains is that, at the

time of his injury the forward end of the reach rod was not fastened or was insecurely fastened to the perpendicular arm at the bottom of the sand dome.

There is certain preparatory work that an engineer is required to do before he takes his locomotive on a trip. This work includes inspection of parts of the locomotive, and examination to make sure of the sufficiency of supplies. A rule of defendant required that enginemen "know by personal examination * * * that there is a full supply of * * * dry sand and other necessary stores," and the evidence was sufficient to warrant the belief, in accordance with plaintiff's contention, that under this rule it was a part of plaintiff's duties, before starting on a run, to look into the sand dome in order that he might know about the supply of sand. To do this it was necessary that he either go on top of the boiler, or climb up the side of the boiler at the sand dome, to a point from where he could look into the dome.

On the side of the locomotive there is a running board extending along the boiler from the cab to the front of the locomotive. About four feet above the running board is a hand rail fastened securely to the boiler. Between the running board and the hand rail, directly below the front of the sand dome, where the injector enters the boiler, is the "boiler check," the top of which is about two feet above the running board. According to the plaintiff's testimony, the top of the boiler check, at the time of the accident, was a flat surface about three inches in diameter. At the time of the trial, the top of the boiler check was a nut about one inch in diameter, and, according to defendant's testimony, it was in the same condition at the time of the accident. The foregoing appliances— running board, hand rail and boiler check—that might be used in climbing up the side of the boiler to the sand dome, are the same on each side of the boiler. On the left-hand side, below the center of the sand dome, there is a

step fastened to the boiler at about the same height as the top of the boiler check. On the right-hand side, there is the hand sander reach rod, already described, extending along the right-hand side of the top of the boiler. The reach rod is above, to the left of, parallel with, and about two feet from, the hand rail. The described appliances, except the reach rod, were, admittedly, in proper condition and of sufficient strength to bear the weight of a man. The reach rod, also, when properly fastened, would have sustained the weight of a man, or, at least, the jury might have so found.

On the night of September 17, 1926, the plaintiff was ordered to leave Casper at 11:30 o'clock p. m., operating a locomotive having the appliances above described. He reported for duty thirty minutes before the leaving time, as he was required to do in order to have time for the preparatory work to which we have referred, and it was while engaged in that work, and while the locomotive was at rest on the "lead" track, that he was injured. When injured, he was attempting to climb to the top of the boiler at the sand dome, for the purpose, as he testified, of examining the sand in the dome and oiling the bell. He was on the running board on the right-hand side of the boiler, below the sand dome, and had in his right hand a kerosene torch and oil can. He put his right foot on the top of the boiler check and then raised himself to a standing position. From there he continued to climb up the side of the boiler. The written transcript of his testimony does not make clear to us his later movements, but it does show that he finally caught hold of the hand sander reach rod a few inches from the front end which was customarily fastened to the perpendicular arm, and that he then attempted to pull himself up. When he thus applied his weight to the reach rod it gave way causing him to fall backward to the ground injuring his back. The evidence warranted the finding that the reach rod

at its forward end was either not fastened or insecurely fastened to the perpendicular arm, and that if it had been fastened as it should have been, it would have sustained the strain to which the plaintiff put it, and he would not have fallen.

The plaintiff's petition, in charging negligence, included the following allegations:

"That the said engine and the parts and appurtenances thereof were defective and were not in a safe condition to operate in the service to which the same were put in order that the same might be employed in the active service of such carrier in moving traffic for hire from the state of Wyoming to and into other states without unnecessary peril to the life and limbs of the plaintiff and the other employees of defendant, in that the said hand sander lever (reach rod) at the forward end thereof was either not fastened at all or was defectively, insecurely, inadequately, negligently, carelessly and unlawfully fastened."

"That one of the purposes for which said hand sander lever (reach rod) was designed and installed by defendant, its officers, agents and employees, was to provide a means for use of this plaintiff and of other engineers in the employ of defendant in climbing up to said sand dome; that no means or appliances of any kind or description were provided on said engine which could be used by this plaintiff for said purpose other than said hand sander lever (reach rod) and that said hand sander lever (reach rod) was customarily and regularly used by this plaintiff and other engineers in the employ of defendant company for said purpose, all which was known to defendant company and approved and assented to by it."

The defendant's answer denied the allegations of negligence and pleaded contributory negligence and assumption of risk. Whether the defect in the reach rod was a violation of the Boiler Inspection Act, cited infra, was the main issue in the case. The defendant contended that the plaintiff, in climbing up the right-hand side of the boiler,

made use of two appliances for purposes which they were not designed—the top of the boiler check, not designed for use as a step, and the reach rod of the hand sander, not designed for use as a hand rail or grab iron. The plaintiff produced as witnesses several enginemen whose testimony tended to show that it was customary, in going to the top of the engine, to do as the plaintiff did, climbing up the right-hand side using the reach rod as a hand hold, and that that was the proper and safer way. Other enginemen, examined on behalf of defendant, testified that the proper and customary way to climb the engine was on the left-hand side where, a step being maintained, it was unnecessary to use the top of the boiler check as a step. And, of course, on the left-hand side, the reach rod would not be used as a grab iron or hand hold. Some of the witnesses testified that it was customary to climb up either side of the boiler, and some who had climbed up the right-hand side testified that they did not use the reach rod as a support or hand hold. There was a ladder up the left-hand side of the boiler near the cab, but it does not seem to be contended that it was the duty of workmen to use the ladder in getting to the sand dome.

The jury, under instructions presently to be noticed, found that the defect in the attachment of the reach rod was a violation of the Boiler Inspection Act, and to dispose of the assigned errors it becomes necessary carefully to consider the applicable federal laws and the construction thereof by the United States Supreme Court.

Section 1 of the Employers' Liability Act of April 22, 1908 (35 Stat. 65, U. S. C., T. 45, Sec. 51, 45 U. S. C. A. par. 51) declares that every common carrier by railroad while engaged in interstate commerce ''shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce  *  *  *  for such injury  *  *  *  resulting in whole or in part from the negligence of any of the officers, agents or employees

of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery * * * or other equipment.''

By Section 3 of the Employers' Liability Act, (45 U. S. C. A. Sec. 53) it is provided that, in all actions brought against any such carrier under the act to recover damages for personal injuries to an employee, ''the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured * * * shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury * * *.''

Section 4 of the same act provides that, in any such action, ''such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury * * *.''

Section 2 of the Boiler Inspection Act, as amended June 7, 1924 (43 Stat. 659, U. S. C., T. 45, Sec. 23, 45 U. S. C. A. Sec. 23) provides:

''Sec. 2. That it shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of this act and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for.''

There can be no doubt that the Boiler Inspection Act was "enacted for the safety of employees" within the meaning of Sections 3 and 4 of the Employers' Liability Act. Great Northern R. Co. v. Donaldson, 246 U. S. 121, 38 S. Ct. 230, 62 L. Ed. 616, Ann. Cas. 1918C, 581. It differs, however, from the Safety Appliance Acts (Act of March 2, 1893, 27 Stat. 531, and Act of April 14, 1910, 36 Stat. 299, U. S. C., T. 45, Ch. 1, Sec. 1 to 16, 45 U. S. C. A. Sec. 1-16) in that the latter require certain named appliances to be installed and maintained, while the Boiler Inspection Act requires in general terms that the locomotive and all parts and appurtenances thereof shall be kept in proper condition and safe to operate in the service to which the same are put. Further, the Boiler Inspection Act, as construed by the courts, confers upon the interstate commerce commission power to specify the sort of equipment to be used on locomotives, and to prescribe rules and regulations by which fitness for service shall be determined. Napier v. Atlantic Coast Line, 272 U. S. 605, 612, 47 S. Ct. 207, 71 L. Ed. 432.

When a carrier fails to install and maintain a safety appliance required by a specific rule promulgated by the interstate commerce commission under authority of the Boiler Inspection Act, we may assume that the consequences would be the same as though there had been a violation of some provision of the Safety Appliance Acts. We doubt whether it can be said that the defendant in the case at bar had violated any rule of the commission. The only rule that is called to our attention is rule 120, above, requiring that locomotives be equipped with proper sanding apparatus which shall be maintained in a safe and suitable condition for service. But the hand sander was only a secondary sanding apparatus, and there was no evidence that the air sander was not in safe and suitable condition and a sufficient compliance with the rule. And if it be admitted that the defect in the hand

sander was a violation of the rule requiring a proper sanding apparatus, it would seem that a workman injured while using the sanding apparatus for another purpose would not be one of those persons for protection of whom the sanding apparatus was required. St. Louis etc. R. Co. v. Conarty, 238 U. S. 243, 249-250, 35 S. Ct. 785, 59 L. Ed. 1290, and authorities there cited. See also Mansfield v. Wagner Elec. Mfg. Co., 294 Mo. 235, 242 S. W. 400; Di Caprio v. New York Cent. R. Co., 231 N. Y. 94, 131 N. E. 746, 16 A. L. R. 940. The case was not submitted to the jury on the theory, nor is it contended here, that there was a violation of the above rule of the interstate commerce commission.

But the reach rod of the hand sander was one of the parts or appurtenances of the locomotive which, by Section 2 of the Boiler Inspection Act, the carrier was bound to keep ''in proper condition and safe to operate in the service to which the same are put,'' and it becomes necessary to inquire as to the meaning of those words in their application to the case at bar. In the case of Baltimore etc. R. Co. v. Groeger, 266 U. S. 521, page 523, 45 S. Ct. 169, 170, 69 L. Ed. 419, it was urged that Section 2 prescribes no definite or ascertainable standard of duty, and the court answered thus (p. 523):

''It imposes upon the carrier a higher degree of duty than theretofore existed. The requirement of the statute is substituted for the common law rule which holds the employer to ordinary care to provide his employees a reasonably safe place in which, and reasonably safe appliances and machinery with which, to work. It is as definite and certain as is the common law rule; and to hold that the duty imposed cannot be ascertained would be as unreasonable as it would be to declare that the common law rule which is ordinarily applied in personal injury actions brought by employees against employers is too indefinite to be enforced or complied with.''

And, on p. 528, of 266 U. S., 45 S. Ct. 172, the court said:

"By the last mentioned section defendant was bound absolutely to furnish what before, under the common law, it was its duty to exercise ordinary care to provide."

It seems important to inquire what, exactly, the employer by the common law is bound to furnish. The general rule is stated in the first foregoing quotation from the Groeger case. But the employer's duty in respect to instrumentalities is restricted to seeing that they are reasonably safe for the performance of the functions for which they are designed. Labatt, Mast. & Serv. (2d) Sec. 921. While various reasons are given for the non-liability of an employer to an employee injured while using an appliance for a purpose for which it was not designed or intended (see Labatt, supra, Sec. 922), we think the true reason is that there has been no violation of a duty owed to the person injured. The master does not anticipate that the appliance will be used for the unintended purpose, and his failure to keep it safe for that purpose is not negligence. See Nelson v. Southern R. Co., 246 U. S. 253, 38 S. Ct. 233, 62 L. Ed. 699. The duty of the employer in such cases seems not unlike the duty of the owner of premises to an invitee. The owner must use care to keep the premises reasonably safe for the protection of the invitee, but there is no duty to foresee that the invitee will exceed his invitation and make use of an appliance for a purpose never contemplated by the owner. See Loney v. Laramie Auto Co., 36 Wyo. 339, 349, 255 Pac. 350, 53 A. L. R. 73, and cases cited.

But it may become the duty of the employer to take reasonable care to keep an instrumentality safe for employees who use it for some new or secondary purpose. Thus, as stated by Labatt, supra, (Sec. 923):

"The master's acquiescence in the use of an appliance for some purpose other than that for which it was intended puts him in the same position as if the appliance had been originally furnished for that purpose. Accordingly, a qualification of this rule, that a servant cannot recover in the absence of evidence showing that the appliance in question was constructed with reference to the use to which it was being put when the accident occurred, is admitted in cases where it appears that it was customary for employees to put it to that use, and that the master knew of this custom."

To illustrate the application of the foregoing common law principles, we make brief reference to a few of the cases.

In Coates v. Boston etc. R. Co., 153 Mass. 297, 26 N. E. 864, 10 L. R. A. 769, the evidence was held sufficient to warrant a finding that plaintiff was ordered into a place where there was a concealed danger known to defendant and not known to plaintiff. It was held that the defendant in the circumstances, ought to have anticipated that the plaintiff, in obeying the order, would proceed in the usual way which was by use of an appliance for a purpose other than that for which it was primarily intended.

In Dunn v. New York, N. H. & H. R. Co., (C. C. A.) 107 Fed. 666, the court thought the evidence sufficient to show that a figure plate that the plaintiff had used as a hand hold was so located that it would "most certainly" be used for that purpose, and that the defendant "knowing it would be so used," should have taken care to maintain it in safe condition for that purpose, or prohibited the use.

In Brimer v. Chicago, B. & Q. R. Co., 109 Mo. App. 493, 85 S. W. 653, standards and planks on a car were primarily intended to keep the load in place, but they "afforded so convenient a means of steadying the standing workmen as the train moved along, that the men would in-

evitably put their hands against them to resist the jolting of the train.'' There was evidence that this use was habitual, and the court held that it ''should have been anticipated by the company, not only as a customary, but a perfectly natural act.''

In McIntyre v. Boston & M. R. R. Co., 163 Mass. 189, 39 N. E. 1012, the plaintiff was injured by the breaking of a stake primarily intended to hold the load on a platform car. The court said that ''the use of the stake as a means of facilitating the passage of a brakeman from car to car of the train made it the duty of the defendant to use due care to see that it was suitable for that purpose.''

In Wood v. Southern R. Co., 104 Va. 650, 52 S. E. 371, the syllabus declares, that:

''Although an appliance may be primarily intended for one purpose, if it is convenient and safe to use it for a secondary purpose, and it is so used by a servant with the knowledge of the master, and without objection on his part, he is chargeable with the duty of using ordinary care to see that such appliance is in a reasonably safe condition for such secondary use.''

In Wallace v. Seaboard Airline R. Co., 141 N. C. 646, 54 S. E. 399, 13 L. R. A. (N. S.) 384, it was held that the case was properly submitted to the jury for them to decide whether the evidence of customary use for a secondary purpose was sufficient ''to fix upon defendant notice thereof.''

In Lyle v. Alabama, Great Southern R. Co. (C. C. A.), 145 Fed. 611, it was said that the facts did not present a case of an appliance furnished solely for one purpose being illegitimately used for another. The custom of using it for the secondary purpose ''grew out of the exigency of the situation, and must have been known to the railway company,'' or, ''at any rate, the jury might have so found.''

In the foregoing cases the employer was held to the duty of care in keeping the appliance safe for the secondary purpose for which the plaintiff was using it at the time of his injury. We refer below to a few of the cases in which it was held that there was no such duty.

In Felch v. Allen, 98 Mass. 572, the plaintiff was injured while using an elevator for a purpose for which it was not intended. His evidence showed that his use of the elevator was improper and unsafe, and there was no proof that "it was ever designed or intended for such a use, or that either of the defendants knew, or had reason to suppose," that it was so used.

In McCauley v. Railway Co., 10 App. D. C. 560, the number plate on defendant's engine was sufficiently secured for all the purposes it was intended to serve, and the court said that plaintiff's use of it as a hand rail could not convert it into an appliance furnished for that purpose, "unless that use was with the knowledge and the express or implied consent of the defendant." The plaintiff testified that he often used it for that purpose but there was "not one particle of evidence tending to show that such use was known to, much less encouraged or acquiesced in by, the defendant."

In Morrison v. Fibre Co., 70 N. H. 406, 47 Atl. 412, 85 Am. St. Rep. 634, the plaintiff was injured while putting the covering of an elevator to a use for which he knew it was not intended. It was said that the evidence did not show "that defendants either intended for the plaintiff to use the elevator as he did, or knew, or were in fault in not knowing, that he was likely to do so."

Chicago, R. I. & P. R. Co. v. Murray, 85 Ark. 600, 109 S. W. 549, 16 L. R. A. (N. S.) 984; and Campbell v. Southern etc. R. Co., 120 Ore. 122, 250 Pac. 622, are cases in which it was held that the evidence was insufficient to warrant the inference that the employer knew of, and acquiesced in, the secondary use, although in each case

there was some evidence of a customary use. In the Arkansas case it was also held that the employee knew of the defective condition of the appliance, and assumed the risk of using it as he did. In the Oregon case the evidence showed, without contradiction, that when the officers of the defendant observed the men using the appliance as plaintiff used it, they forbade the practice because of its obvious dangers.

This question received careful consideration in Babcock Bros. Lbr. Co. v. Johnson, 120 Ga. 1030, 48 S. E. 438, where Lamar, J., said, among other things, that:

"For if the master directs an appliance to be used, or knows that it will reasonably be used for some purpose other than that for which it was originally intended, he puts it in the same position as if he had originally furnished it for that purpose. But the fact that it has been diverted to a new use will not render him liable if that diversion occurred without his knowledge or consent."

The foregoing authorities are in substantial agreement as to common law principle that, before the employer can be held negligent in this class of cases, the evidence must be sufficient to justify the inference that he knew of, and acquiesced in, the use of the appliance for the purpose for which it was being used at the time of plaintiff's injury. Whatever apparent disagreement there is in the cases arises on the question of the sufficiency of the evidence to justify that inference.

The phrase "in the service to which the same are put," as contained in Section 2 of the Boiler Inspection Act, must be taken to mean the service for which the appliance is designed, or to which it is put with the employer's knowledge and acquiescence. The common law duty to exercise ordinary care to keep appliances reasonably safe for such purposes has, by the statute, become an absolute duty to keep them safe for the same purposes.

It would seem that the foregoing view as to the meaning of the statute was in the mind of the plaintiff when he alleged in his petition that the reach rod of the hand sander ''was customarily and regularly used by this plaintiff and other engineers in the employ of defendant company for said purpose''—as a hand hold in climbing to the sand dome—''which was known to defendant company and approved and assented to by it.'' If the jury, under proper instructions, had found that allegation to be true, there might have been no reason for doubting that their verdict established defendant's liability for violation of the Boiler Inspection Act. But the jury did not find that the use of the reach rod as a hand hold was known to, approved, or assented to, by defendant.

Under instructions, too long to be quoted in full, the jury were told that the words ''in the service to which the same are put,'' contained in the Boiler Inspection Act, meant a proper and reasonable service or use in view of all the evidence, and that, if they found from the evidence that the service or use to which the plaintiff put the reach rod, in using it as a hand hold or support, was proper and reasonable, it was the absolute duty of defendant to keep it safe for that purpose. It is quite clear that the jury must have taken the instruction to mean that they should determine whether the use was proper and reasonable from plaintiff's viewpoint. To return a verdict for plaintiff, the jury were not required to find that the defendant knew that the reach rod was customarily used as a hand hold or that it ought to have anticipated such a use. Whether or not the defendant should have anticipated or thought that the reach rod might or would be so used, was only one of many matters which the jury were told they should consider in deciding whether such a use was reasonable and proper. The law, on the contrary, seems to be that whether or not the use as a hand hold was reasonable and proper was only one of the matters the

jury should have considered in determining whether or not the defendant knew of, and acquiesced in, the use. We think the instructions on the foregoing point, one of the important issues in the case, were clearly erroneous.

The plaintiff's contention, which prevailed at the trial, that Section 2 of the Boiler Inspection Act made it the duty of the defendant to maintain the reach rod in safe condition for any reasonable and proper use to which it might be put by employees, and that the common law rule as to the intended use has no application, is urged upon authority of cases under the Safety Appliance Act, notably Louisville & N. R. Co. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. Ed. 931, and Davis v. Wolfe, 263 U. S. 239, 44 S. Ct. 64, 68 L. Ed. 284, Section 2 of the Safety Appliance Act, (U. S. C., T. 45, Sec. 2, 45 U. S. C. A. Sec. 2), made it unlawful to use a car not equipped with couplers coupling automatically by impact, ''and which can be uncoupled without the necessity of men going between the ends of cars.'' In answer to the contention that this provision was intended for the protection of only those men injured when between cars for the purpose of coupling or uncoupling them, the court said (Louisville & N. R. Co. v. Layton, supra, at p. 621 of 243 U. S., 37 S. Ct. 457) :

''While it is undoubtedly true that the immediate occasion for passing the laws requiring automatic couplers was the great number of deaths and injuries caused to employees who were obliged to go between cars to couple and uncouple them, yet these laws as written are by no means confined in their terms to the protection of employees only when so engaged. The language of the acts and the authorities we have cited made entirely clear that the liability in damages to employees for failure to comply with the law springs from its being made unlawful to use cars not equipped as required—not from the position the employee may be in or the work which he may be doing at the moment when he is injured. This effect can be given to the acts and their wise and humane purpose can be accomplished only by holding, as we do,

that carriers are liable to employees in damages whenever the failure to obey these safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty."

Section 4 of the same act (U. S. C., T. 45, Sec. 4, 45 U. S. C. A. Sec. 4), made it unlawful to use a car not provided with secure grab irons or hand holds "for greater security to men in coupling and uncoupling cars." On authority of the coupler cases it was held that the protection of Section 4 was not limited to employees who were engaged in coupling operations. Davis v. Wolfe, supra. The court in stating the rule deducible from the coupler cases, said (263 U. S. p. 243, 44 S. Ct. 66), among other things, that the employee "can recover if the failure to comply with the requirements of the act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection."

These cases under the Safety Appliance Acts, where the carrier had failed in its statutory duty to keep safe a particular appliance specifically required, do not go so far as to hold that an action for damages can be maintained under the statute by one who was injured while using the appliance for a purpose for which it was not designed. Whether the plaintiff was within the class of persons for whose benefit the appliance was required to be maintained—whether his injury was within the evil against which the provisions for appliances was directed —is still recognized as a proper test to determine whether the violation of the statute is negligence *per se,* as to the plaintiff, so as to entitle him to the advantages of Sections 3 and 4 of the Employer's Liability Act. St. Louis & S. F. R. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290. In Chicago, Great Western R. Co. v. Schen-

del, 267 U. S. 287, 45 S. Ct. 303, 69 L. Ed. 614, the court was careful to say that it had not intended to modify or overrule anything said in the Conarty case.

When, in Davis v. Wolfe, supra, and in other cases, it is said that the defendant is liable because its violation of the statute was a proximate cause of the accident, it must be understood that the court held or assumed that, under the foregoing test, the violation of the statute was a breach of duty to the plaintiff in the situation in which he was injured. The question of breach of duty is anterior to the question of remote or proximate cause. Palsgraf v. Long Island R. Co., 248 N. Y. 339, 346, 162 N. E. 99; Delaware, L. & W. R. Co. v. Koske, 49 Sup. Ct. 202, 73 L. Ed. 1.

When we apply the test of the Conarty and Schendel cases to the case at bar, it would seem that, unless, under the above common law principles, it was the duty of defendant to keep the reach rod safe for use for the purpose for which plaintiff was using it when he was hurt, the plaintiff was not within the class of persons for whose benefit the appliance was required to be kept in proper condition and safe to operate.

Lehigh Valley R. Co. v. Howell, (C. C. A.) 6 Fed. (2d) 784, another case of violation of the Safety Appliance Act, is relied on by the plaintiff in support of the theory on which the case at bar was submitted to the jury. In that case, the wheel of a defective brake was used by plaintiff as a hand hold in mounting a car for the purpose of releasing the brake. The defendant contended that the plaintiff was using the brake for a purpose for which it was not intended. How that contention was made and disposed of in the trial court is not shown by the opinion. When, in the appellate court, the defendant argued that the plaintiff took hold of the brake wheel only as a matter of convenience, the court answered:

"But he did more than that. He proceeded up the ladder to the brake platform to take hold of this very brake wheel to turn it in the process of releasing the brakes. It was the expected thing for him to do in proceeding with his work. The fact that it might have kept his balance, or that the brake handle was of some assistance to him in finishing his climb up the ladder, was no matter of mere convenience. It was the one thing for him to take hold of."

And it was held that "the brake was incidentally used in going to the point where the brake was to be released by turning the hand wheel," and the case within the Safety Appliance Act, on authority of Davis v. Wolfe, supra.

In the case at bar, plaintiff's use of the reach rod as a support was not incidental to any operation that required him to use it for the purpose for which it was designed. It seems from the evidence that, even on plaintiff's own theory, he would not have been in a situation where he could be expected to use the reach rod as a support, unless he had used still another appliance—the boiler check —for a purpose for which the defendant claimed it was not designed.

The defendant contends that the practice, if it existed, of using the reach rod as a hand hold was not so general as to have become a custom; that before any question of custom could be submitted to the jury, the evidence should show that the custom was universal, notorious, uniform, etc.; and that the evidence in this case shows, without contradiction, that some of the men did not follow the custom alleged by plaintiff.

This contention is based mainly on what is said in Chicago, M. St. P. R. Co. v. Lindeman, C. C. A., 143 Fed. 946. That case, when considered in connection with the later case by the same court, St. Louis & S. F. R. Co. v. Jeffries, 276 Fed. 73, hardly supports the contention. The plaintiff,

as we understand the authorities, was not required to prove that the practice amounted to what in law is technically known as a custom. The word "custom" is often employed by the courts, especially in negligence cases, in its more popular sense of practice or course of action. 17 C. J. 446. See Fletcher v. Baltimore & P. R. Co., 168 U. S. 135, 18 S. Ct. 35, 42 L. Ed. 411, wherein Snow v. Flitchburg R. Co., 136 Mass. 552, 49 Am. Rep. 40, is cited with approval. In the Massachusetts case it was held that the court was justified in inferring that the defendant knew, or, in the exercise of proper care, ought to have known of a practice from evidence tending to show that mailbags "had not unfrequently been thrown" from a car in a particular way. See, also, Carter v. Sioux City Service Co., 160 Ia. 78, 87, 141 N. W. 26. We are of opinion that the evidence of the customary use of the reach rod as a hand hold was not rendered immaterial by the fact that some of the enginemen denied the practice.

As the case must be remanded for a new trial, we need not decide whether the evidence of customary use, together with the other evidence, would have sustained a finding that the defendant violated the Boiler Inspection Act by failing to keep the reach rod safe for the purpose for which plaintiff used it. It would be rash for us to undertake to state a general rule or test for determining the sufficiency of the evidence for that purpose.

The instruction on the measure of damages did not explain that in computing the damages for loss of future earnings, adequate allowance should be made for the earning power of money. See Chesapeake & O. R. Co. v. Kelly, 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367; Chicago & N. W. R. Co. v. Ott, 33 Wyo. 200, 219, 237 Pac. 238, 238 Pac. 287. The given instruction probably was not erroneous in the absence of a request for a more detailed instruction. Louisville & N. R. Co. v. Halloway, 246 U. S. 525, 38 S. Ct. 379, 62 L. Ed. 867. The

defendant requested a more detailed instruction, but the plaintiff contends that the instruction offered by defendant was properly refused because it included the statement that the jury should take into consideration the fact that in later years the plaintiff's earning capacity might decrease. In the Ott case, supra, we held that the failure to tell the jury that they should take into consideration the probable diminution of plaintiff's earning capacity with advancing years was not error in the absence of a request for an instruction to that effect, ''particularly in view of the fact that the members of the jury were aware, as everybody else must be, that earning capacity is apt to decrease with advancing years.'' We need not decide whether the refusal to give an offered instruction on that subject would be error. We think the giving of it would not be error, at least in the case of a plaintiff in middle life, as in the case at bar. Its inclusion in the defendant's offered instruction was probably no sufficient reason for the failure to tell the jury of the applicable rule, that has become an integral part of the federal laws, to be followed in computing the amount to be allowed for loss of future earnings. A more positive statement of our view on this question of court's duty to give the instruction, as offered, is unnecessary, as, on another trial, the question will probably not arise in the same way.

The judgment will be reversed, and the case remanded for a new trial.

*Reversed and Remanded.*

BLUME, C. J., and RINER, J., concur.